# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

### NO. 03-09-00079-CR

**Mark David Barshaw, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF BELL COUNTY, 264TH JUDICIAL DISTRICT
### NO. 62761, HONORABLE MARTHA J. TRUDO, JUDGE PRESIDING

## D I S S E N T I N G   O P I N I O N

I agree with the majority that the trial court abused its discretion in permitting Barthlow to testify that mentally retarded persons, as a class, tend to be truthful. *See Schutz v. State*, 957 S.W.2d 52, 70 (Tex. Crim. App. 1997) ("*Schutz I*"); *Yount v. State*, 872 S.W.2d 706, 711 (Tex. Crim. App. 1993). However, because I would hold that the error is harmless, I respectfully dissent.

A trial court's evidentiary rulings, including those involving error under *Schutz I* and *Yount*, are subject to harmless error analysis. *See Schutz v. State*, 63 S.W.3d 442, 443 (Tex. Crim. App. 2001) ("*Schutz II*") (holding that admission of testimony that was "direct comment on the truthfulness of complainant's allegations" was harmless error). The rules of appellate procedure provide that any error other than constitutional error "that does not affect substantial rights must be disregarded." Tex. R. App. P. 44.2(b). Substantial rights are not affected by the erroneous

admission of evidence if, after examining the record as a whole, the court has a fair assurance that the error did not influence the jury, or had but a slight effect. *Schutz II*, 63 S.W.3d at 444.

With regard to violations of *Schutz I* and *Yount*, the "danger posed by the erroneous admission of expert testimony that was a direct comment on the complainant's credibility was that the jury could have allowed that testimony to supplant its decision." *Schutz II*, 63 S.W.3d at 445. In evaluating whether the jury's decision on the credibility of witnesses was supplanted, the court must consider everything in the record, including testimony and physical evidence, the nature of the evidence supporting the verdict, and the character of the error and its relationship to other evidence. *Id.* Additionally, courts may also consider other factors, including the trial court's instructions to the jury, the theories of the case that the State and defendant have espoused, and arguments to the jury. *Id.* at 444-45.

*Evidence Admitted at Trial*

The initial inquiry concerns the evidence admitted at trial, including the evidence supporting the verdict. The majority states that this was a "she said, he said" case. However, there was a great deal of additional evidence and testimony that the jury could have considered when determining the relative credibility of the witnesses and reaching its verdict.

Regarding the evidence supporting K.B.'s testimony, K.B. testified at trial that Barshaw had removed her pajamas and underwear and had then touched her breasts and her "pelvis." Though K.B. functions at roughly the level of a ten-to-twelve year old with a verbal IQ of 67 and an estimated actual IQ in the fifties, her testimony at trial was consistent with both the initial outcry she

2

made to her mother and to the statements she gave to the investigating officer and to Kleypas, the SANE nurse.[1]

Further, the physical evidence at trial was also consistent with K.B.'s testimony. Kleypas examined K.B. on the same day as the alleged incident. While K.B. indicated that she did not remember whether Barshaw had penetrated her when touching her pelvis, Kleypas's examination revealed an abrasion inside of K.B.'s labia majora that could only have been caused by penetration.[2] Kleypas testified that the abrasion was recent, as the skin in the affected area of the body heals very quickly. According to Kleypas, the abrasion would have caused bleeding at the time it happened, and clothing put up against the area would have blood on it. Forensic scientist Patricia Retzlaff found blood stains on K.B.'s pajama shorts and on her bedsheets, which DNA tests showed was K.B.'s blood.[3] This evidence is consistent with K.B.'s testimony.

While Barshaw's testimony contradicted that of K.B., there is other evidence in the record besides K.B.'s testimony that conflicts with Barshaw's testimony. Specifically, the testimony of Berndt, K.B.'s mother, differs from Barshaw's in several important respects. According to Barshaw, on the morning of the alleged incident, he saw Berndt at the store where she works and told her that he needed to check on the heater in Berndt's home; he then proceeded to her home and

---

[1] While defense counsel alluded during closing to a statement K.B. made that she was "mad" at Barshaw prior to her outcry, the record contains no other indication of a motive for K.B. to lie or to concoct her story.

[2] There is no evidence in the record to indicate that K.B. was sexually active at the time of the alleged incident. Porter, K.B.'s MHMR caseworker for two years, stated that to her knowledge, K.B. had never had a romantic or sexual relationship.

[3] There was no blood, however, on the panties K.B. indicated she was wearing after the incident, nor was the DNA of any other person found on K.B.'s clothing or bedsheets.

encountered K.B. there. Berndt, however, testified that Barshaw asked about the heater, but that she told him that there were no problems with it, and that she did not give him permission to go to her home that day. Barshaw also testified that he returned to Berndt's home—where K.B. was—the next day to look for his "multimeter," a piece of equipment he thought he had left behind. While Barshaw testified that he drove to the home and then found the multimeter in his truck, Berndt, who had followed him, testified that Barshaw instead attempted to enter the home, finding the door to be locked. She relayed this information to 911 as the incident was in progress. In addition, Barshaw testified that he did not know as of the date of the incident that K.B. was mentally retarded, despite having had several conversations with K.B. Berndt, however, testified that it was "common knowledge" that K.B. was mentally challenged, and Kleypas testified that she could tell that K.B. exhibited signs of developmental delay when she first met her. This conflicting testimony provides a basis for the jury to discredit Barshaw's credibility even without K.B.'s testimony.

In addition, portions of Barshaw's own testimony place him at the scene of the incident. Barshaw himself admitted that he was in the house alone with K.B. on the date of the incident in question, and consequently had the opportunity to engage in the charged acts. He further stated that he had grasped her shoulders and given her a kiss on the cheek when she told him it was her birthday.[4] In addition, Barshaw admitted that he returned to the home the next day without having asked Berndt's permission.

---

[4] The date of the incident was December 18th. Berndt testified that K.B.'s birthday is December 30th.

Given the testimony and physical evidence admitted at trial, I disagree with the majority that this was simply a "she said, he said" case. Further, even if the outcome rested solely on the jury's credibility assessments of K.B., the fact that the prosecution is grounded on the credibility of the victim, while significant, is not conclusive in determining harm. *Schutz II*, 63 S.W.3d at 446. Even in cases in which credibility is paramount, Texas courts have found violations of *Schutz I* and *Yount* to be harmless where the record as a whole provides adequate assurance that the jury was able to exercise its function to determine the credibility of witnesses. *See id.* (holding error was harmless even though "the case against the appellant rested on the credibility of the complainant").

*Character of the Error*

The next inquiry concerns the character of the error and its relationship to the other evidence. When asked about the ability of mentally retarded people to "fabricate or make up elaborate stories," Barthlow stated:

> Generally speaking if you're—when we're dealing with mental retardation and there's not anything going on, there's just a diagnosis of mental retardation, primarily, there's not a personality disorder or something adding to that, it's been my experience that folks with mental retardation can be painfully honest, really. I mean, it's like a little kid who looks at somebody and says in the supermarket, "You're really old," or, you know, what little kids say.

The defense objected, indicating that the "testimony is not relevant because you cannot testify to a class of people being truthful." The trial court overruled the objection, and Barthlow continued:

5

I was discussing individual's mental retardation, and kind of their ability to make up things. I'm not going to say it would never happen. I mean, anybody is capable of making up something, but it's very simplistic in nature. It would be—like I said, it would be like a lie that a child would tell, a story a child would make up. It would be very easy as an adult or parent to kind of see through that when you're thinking of that. And, again, it's been my experience in the hundreds and hundreds of people with mental retardation that I've seen, that it's more going to be that they're painfully honest. They haven't learned the social skills and probably never will to know when you should lie or when it would be socially appropriate to not tell the truth because it might hurt someone's feelings, or things of that nature, to hold things back. They just say what comes into their minds, very much, again, like a six- or seven-year-old child would. They see something and they make an observation, and they're going to say that because they haven't learned the social etiquette of when that's appropriate and when that's not appropriate.

As recognized above, portions of this testimony involve the propensity of mentally retarded people as a class to be truthful, and are consequently inadmissible under *Schutz I* and *Yount*. However, it is noteworthy that Barthlow equivocated at the start of the statement, saying, "I'm not going to say it would never happen. I mean, anybody is capable of making up something . . . ." *Cf. Long v. State*, No. 12-07-00256-CR, 2009 Tex. App. LEXIS 1090, at *8 (Tex. App.—Tyler Feb. 18, 2009, no pet.) (mem. op., not designated for publication) (holding error harmful where expert "staked her reputation on her conclusion that there was nothing troubling about the complaining witness's testimony and the State's case"). In addition, the quoted passages constitute the entirety of Barthlow's impermissible testimony. She did not revisit or expand her statements at any other time during the trial, nor did the State attempt to elicit any further testimony on the matter. *See Garza v. State*, No. 05-04-01104-CR, 2006 Tex. App. LEXIS 69, at *12 (Tex. App.—Dallas Jan. 5, 2006, pet. ref'd) (mem. op., not designated for publication) (noting that "[t]he State did not pursue the matter further" after erroneous admission of *Schutz/Yount* testimony in holding error harmless).

6

Further, an examination of the relationship of the error to the other evidence in the record indicates that the jury had much more than just Barthow's testimony on which to gauge the credibility of K.B. *See Schutz II*, 63 S.W.3d at 446 (holding error harmless where inadmissible expert testimony was "a small portion of a large amount of evidence presented that the jury could have considered in assessing the victim's credibility"). First and foremost, the jury was able to listen to K.B.'s own testimony in its entirety, and to make its own determinations based on their observations of her during her time on the witness stand. The jury was also presented with the physical evidence described above, including evidence that K.B. had been penetrated in a manner consistent with the offense charged. Finally, the jury was able to hear the competing testimony of Barshaw in addition to character witnesses supporting Barshaw in making its determination. While the majority relies on the assertion that Barshaw "was, on the face of it, a credible witness," the fact that the jury was able to evaluate his conflicting testimony reinforces the notion that the jury had a large amount of evidence to consider beyond the testimony of the expert in making its credibility determinations. *See id.* (indicating that harm of error was mitigated by amount of other evidence jury heard, including testimony that defendant "was a truthful, peaceful, law-abiding person who exhibited no unnatural sexual tendencies toward children").

*Jury Instructions*

Turning to the instructions given to the jury, the record indicates that the jury was explicitly instructed, "You are the exclusive judges of the facts proved, of the credibility of the witnesses and of the weight to be given to the testimony." This instruction reinforced the jury's role in making credibility determinations. *See Wilson v. State*, 90 S.W.3d 391, 394 (Tex. App.—Dallas

2002, no pet.) (noting that "the trial court instructed [the jury] that they were the exclusive judges of a witness's credibility" in finding error harmless).

*Closing Argument*

Finally, as noted by the majority, the State did not reference the inadmissible portion of Barthow's testimony during closing. Further, the State began its argument, "You saw [K.B.] You got to see her in person. And that's important, for you all to see her, to hear her, *and to judge her credibility*." (Emphasis added.) The State also made other references to the credibility determination at the heart of the case, telling the jury, "You're going to have to decide who you believe, [K.B.], or Mark Barshaw." These statements indicated that the ultimate determination of credibility rested with the jury. *See id.* (noting that "[d]uring closing arguments, the State emphasized to the jurors that they were the judges of [complainant]'s credibility and never referred to [inadmissible] testimony about the percentage of children who lie about being sexually abused" in finding error harmless).

Based on this review of the record as a whole, including the evidence admitted at trial, the character of the error and its relationship to the evidence, the instructions given to the jury, and the State's closing argument, I conclude that there is a fair assurance that the error did not influence the jury, or had but a slight effect. *See Schutz II*, 63 S.W.3d at 444-46; *Wilson*, 90 S.W.3d at 394; *Garza*, 2006 Tex. App. LEXIS 69, at *12 (holding *Schutz/Yount* error harmless because jurors were presented with large amount of evidence to consider in making credibility determination, State did not pursue inadmissible evidence after admission of initial testimony, jury was instructed that it was sole judge of credibility of witnesses, and State did not reference *Schutz/Yount* testimony during

8

closing).  As I would therefore overrule Barshaw's first issue and proceed to address his remaining issues on appeal, I respectfully dissent.

_____

Diane M. Henson, Justice

Before Chief Justice Jones, Justices Waldrop and Henson

Filed:   August 31, 2010

Publish